IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

UNITED STATES OF AMERICA,

    Plaintiff,

vs.                              Case No. 09-10099-JTM

BERNARD REDD, ET AL.,

    Defendants.

MEMORANDUM AND ORDER

On September 17, 2010, the court took up for hearing three motions by defendants Adrian Patterson and Bernard Redd. In elaboration of and consistent with the findings of the court expressed at the conclusion of that hearing, the court enters the present order denying the relief sought by the defendants.

**1. Patterson's Motion to Exclude Co-Conspirators' Statements (Dkt. 175).**

Defendant Patterson's motion seeks exclusion of the co-conspirators' statements identified in the *James* hearing. Having reviewed the record and the arguments of the parties, the court finds no reason to alter its provisional ruling at the end of that hearing, holding that there was evidence from which a rational fact-finder could conclude that a conspiracy likely existed, and that the relevant statements were made in furtherance of that conspiracy.

In the present motion, Patterson argues:

> There was no common plan in this case. Mr. Redd was like the milk man who delivers his products to his individual customers. Assuming Mr. Patterson purchased any contraband from Mr. Redd, Mr. Patterson did not know about the other persons who sold to or purchased from Mr. Redd. There is no evidence that any person agreed to purchase exclusively from Mr. Redd or on a regular basis from Mr. Redd or transacted with Mr. Redd because of Mr. Redd's association with Mr. Patterson.
>
> ....
>
> There is no evidence of a conspiracy between Mr. Patterson and Mr. Redd. The wiretap conversations and even the statement Mr. Redd allegedly made to Mr. Bradley contain nothing more than alleged discussions by a seller, Mr. Redd, about a buyer. There is no mention of any other person being party to the transactions between Mr. Redd and Mr. Patterson. There are a few references to the suppliers used by Mr. Redd, but no evidence that Mr. Patterson knew those persons. There is no evidence that Mr. Patterson knew the identity of other customers of Mr. Redd. There is absolutely no evidence of any interdependence among the alleged co-conspirators.

(Dkt. 176 at 9-10).

The court finds that these arguments do not support the relief sought in his motion—exclusion of the co-conspirators' statements—because knowledge of all the details of the conspiracy, or even of all of the identities of the members of the conspiracy, are not essential elements of the offense. Tenth Circuit Pattern Jury Instruction 2.87 provides

> To be a member of the conspiracy, the defendant need not know all of the other members or all of the details of the conspiracy, nor the means by which the objects were to be accomplished. Each member of the conspiracy may perform separate and distinct acts. It is necessary, however, that for the defendant to be a member of the conspiracy, the government must prove beyond a reasonable doubt that he was aware of the common purpose and was a willing participant with the intent to advance the purposes of the conspiracy. In other words, while a defendant need not participate in all the acts or statements of the other members of the conspiracy to be bound by them, the acts or statements must be interdependent so that each member of the conspiracy depends upon the acts and statements of the other conspirators to make the conspiracy succeed.

*See also United States v. Eads*, 191 F.3d 1206, 1210 (10th Cir. 1999) (government need not show defendant knew of specifics of the conspirators' plans, or his "general awareness" of the conspiracy's scope and goal).

Similarly, contrary to Patterson's argument, there is no requirement that the conspiracy be successful in its goals, or that a conspiracy exists only if it relates to a "large" quantity of narcotics. As to the defendant Patterson, the government need prove only that two or more persons agreed to break the law, that Patterson knew of the essential object of the conspiracy, knowingly and voluntarily participated in the agreement, and that the conspirators depended on one another to further their agreement. *United States v. Pulido-Jacobo*, 377 F.3d d1124, 1129 (10th Cir. 2004).

None of the arguments advanced by Patterson justify exclusion of the evidence. By a preponderance of the evidence, the intercepted calls demonstrate the existence of an agreement among Redd, Patterson and others to obtain and distribute narcotics. Redd, Patterson and other persons worked together to obtain drugs, obtain payment or financing for the sale of drugs, discussed how to use cell phones and coded language to avoid police investigations, how the drugs should be priced, and identifying unreliable customers. Contrary to the suggestions of Patterson, the telephone calls are neither the innocuous conversations of casual acquaintances, nor unnecessarily redundant or repetitive, since the collective nature of the evidence is necessary to demonstrate the nature, context, and duration of the conspiratorial agreement.

Finally, Patterson relies on *United States v. McIntyre*, 836 F.3d 467 (10th Cir. 1988), as demonstrating that evidence showing a mere buyer-seller relationship as to illegal drugs is insufficient to show a conspiracy. But, as the Tenth Circuit has subsequently noted, the *McIntyre* rule is limited to instances in which purchase occurs at the end of the distribution chain:

3

> Flores argues that he cannot be held to be a member of the Maass conspiracy because his relationship with Maass was merely that of buyer-seller. For this proposition Flores relies upon this court's decisions in *United States v. Fox*, 902 F.2d 1508, 1514 (10th Cir.1990), and *United States v. McIntyre*, 836 F.2d 467, 471 (10th Cir.1987). In those cases we held that the buyer in a retail drug transaction cannot, as a general rule, be deemed part of the larger conspiracy that brought him the drug. *See Fox*, 902 F.2d at 1514 ("One who merely purchases drugs or other property from a conspirator does not thereby become a member of the conspiracy."); *McIntyre,* 836 F.2d at 471 ("[P]*roof of the existence of a buyer-seller relationship, without more, is inadequate to tie the buyer to a larger conspiracy ....*") (further quotation and citation omitted). However, "the purpose of the buyer-seller rule is to separate consumers, who do not plan to redistribute drugs for profit, from street-level, mid-level, and other distributors, who do intend to redistribute drugs for profit, thereby furthering the objective of the conspiracy." [*United States v.*] *Ivy*, 83 F.3d [1266,] 1285-86 [(10th Cir. 1996)]. Flores was not a street-level retail drug *purchaser*, he was a wholesale seller who knowingly helped supply large quantities of methamphetamine to a distribution organization, an organization that in turn relied in great part upon Flores' efforts for its success. The retail buyer rule simply does not apply to Flores. Based on the evidence adduced at trial, a reasonable jury easily could have found that Flores was a willing member of the distribution conspiracy.

*United States v. Flores*, 149 F.3d 1272, 1277 (10th Cir. 1998) (emphasis in *Flores*).

The rule in *McIntyre* has no application where, as here, the evidence shows the defendants were higher up in the distribution chain. Patterson's motion must be rejected because, in the light of the evidence submitted by the government, a rational finder of fact could conclude that the defendants were knowing participants in an on-going agreement to distribute illegal narcotics, and that they acted interdependently with each other in furthering this agreement. The telephone communications were an integral part of advancing the agreed-upon distribution. *United States v. Heckard*, 238 F.3d 1222, 1231-32 (10th Cir. 2001).

Accordingly, the court finds that the government may introduce during the trial the evidence referenced during the *James* hearing.

**2. Patterson's Motion to Suppress Cell Site Location Information (Dkt. 179)**

This motion by Patterson focuses on the government's use of electronic information to track his cell phone movements. Specifically, the information showing that Patterson was in Dallas on December 1 and 2 of 2008, before returning to Wichita on December 2. According to Patterson, this information led to surveillance and a December 2 traffic stop of Patterson and an associate, Wade Fields. Other than the identity of Fields, the police learned nothing from the stop and found no narcotics.

Later, similar tracing was used to determine that Patterson traveled to Dallas to meet with Redd in January of 2009. Patterson states in his motion that on January 16, 2009, "[u]sing cell site information, DEA Dallas agents were able to locate Mr. Patterson in Desoto, Texas and establish surveillance on him. Mr. Patterson and two unknown associates were followed to several businesses in the area, but surveillance was terminated when Mr. Patterson began taking evasive actions." (Dkt. 179, at 3).

In both December and January, the police followed the initial cell phone tracking information, which was given by the cellular phone provider at the government's request, with administrative subpoenas which directed the provider to produce business records relating to the relevant telephone number. On March 23, 2009, the government submitted an application for wiretap on this telephone number. The government submitted a 28-page affidavit in support of the request.

Finally, in June of this year and in preparation for the present trial, the government again obtained a subpoena for the records relating to Patterson's telephone number.

Patterson asks that the "real time" disclosure of his location to the police be suppressed, and that, in light of the inclusion of two references to "cell site disclosure" in the affidavit for warrant,

5

the court should suppress all of the evidence gained from the wiretap. Citing *In re Application of U.S. for an Order (1) Authorizing the Use of a Pen Register and a Trap and Trace Device*, 396 F.Supp.2d 294, 15 A.L.R. Fed. 2d 803 (E.D. N.Y. 2005), Patterson argues that the government was prohibited from obtaining information regarding the location of his cellular telephone except by warrant upon a showing of probable cause.[1]

With respect to the December and January "real time" location disclosures, the government states in its response that it does not intend to introduce evidence relating to such tracking. In addition, the government contends that the evidence would be admissible in any event, since it subsequently obtained information relating to the tracking through independent and lawful means (the administrative and trial subpoenas). With respect to the traffic stop of the defendant once he returned to Wichita, the government argues both that, since the police were actively on the lookout for Patterson, the stop was inevitable, and that Patterson has no reasonable expectation of privacy as to his location when he is driving on public streets. *Katz v. United States*, 389 U.S. 347, 351 (1967) (no Fourth Amendment right in "what a person knowingly exposes to the public, even in his home or office"). In addition, the government argued at the hearing on Patterson's motion that the present case is distinguishable from the cases cited by defendant, where the question was what standard should be required for the government to *compel* the production of CSLI. In the present case Patterson's cellular provider *volunteered* the CSLI based on a mere request by the government.

---

[1] *See also In re Application of United States*, ___ F.Supp.2d ___, 2010 WL 3021950 (W.D.Tex. July 29, 2010). Other courts, however, have concluded that the government may obtain orders for cellular site location information (CSLI) pursuant to the Stored Communications Act, 18 U.S.C. §§ 2701-2711 (2010), based upon a showing of specific and articulable facts establishing reasonable grounds that a customer's CSLI was relevant and material to an ongoing criminal investigation, a standard less than probable cause.

Accordingly, it suggests, Patterson may have a claim against his provider, but he has not shown any violation of his Fourth Amendment rights.

The court categorically rejects the government's last argument. A search by a private citizen is generally not subject to the Fourth Amendment. However, the Fourth Amendment may be implicated if the private individual conducts the search while acting as, or in concert with, a government agent. *United States v. Jacobsen*, 466 U.S. 109, 113, 104 S.Ct. 1652, 80 L.Ed.2d 85 (1984). "[A] search by a private citizen may be transformed into a governmental search ... if the government coerces, dominates or directs the actions of a private person conducting the search or seizure." *United States v. Smythe*, 84 F.3d 1240, 1242 (10th Cir.1996) (quotation omitted). The inquiry is two-pronged, the court looking first to "whether the government knew of and acquiesced in the [individual's] intrusive conduct," and second, "whether the party performing the search intended to assist law enforcement efforts or to further his own ends." *United States v. Souza*, 223 F.3d 1197, 1201 (quotations omitted). Applying a similar standard to the actions of a cellular telephone provider, who went beyond the government's lawful warrant and supplied text messages for dates outside the scope of the warrant, the court in *United States v. May*, 440 F.Supp.2d 1016, 1041-42 (D. Minn. 2006), held that a cellular provider was not a government agent. But the court stressed there was no evidence that the government directed or encouraged the supplying of the additional information. In the present case the opposite is true, the totality of the circumstances of the case suggesting both the government actively encouraged the cellular provider to supply the requested information, and that the provider was primarily motivated by a desire to aid in the government's request. Accordingly, the court finds that the supposed voluntariness of the cellular provider's actions are not an independent basis for denying Patterson's motion.

However, the court does find that the "real time" CSLI disclosures should not be suppressed as they either were going to be produced, or would have been inevitably discovered, as a result of the government's subsequent subpoenas. *Murray v. United States*, 487 U.S. 533, 537 (1988). Second, the investigation's discovery of CSLI simply allowed the police to confirm the defendant's general location, even as they were observing locations he was known to frequent. The defendant had no reasonable expectation of privacy as he moved in plain view on public highways. *See Katz*, 389 U.S. at 351; *United States v. Knotts*, 460 U.S. 276 (1983) (use of tracking device in a drum carried in defendant's vehicle was not illegal, as no reasonable expectation of privacy extended to the vehicle's travels on public highways).

A separate question exists as to Patterson's request to suppress all the results from the wiretap warrant, but the result is the same. First, even assuming the cell phone provider should not have turned over the "real time" tracking, the information was independently obtained by administrative subpoenas prior to the issuance of the warrant. Second, even if the tracking is excised from the affidavit for warrant, it would not have affected the existence of probable cause. That is, the affidavit does not depend upon the cell site tracking, or feature such tracking even in a supporting role.

Instead, there are two passing references to "cell site disclosure" in the course of the 28-page affidavit. Rather than the cell site tracking, the affidavit discusses the police investigation in detail, including the background and details of the investigation, prior applications for warrant, toll and pen register analysis, and the persons expected to be intercepted. Because the cell phone tracking, which, when all is said and done, showed only that Patterson had traveled from one city to another, was at most of tangential importance and does not affect the probable cause established in the rest of the

affidavit, Patterson's motion should be denied. *See United States v. Chavez-Miranda*, 306 F.3d 973, 979 (9th Cir. 2002) (court need not hold hearings to determine the adequacy of an affidavit for warrant where the challenged information is not material to the existence of probable cause).

**3. Redd's Motion to Suppress (Dkt. 163)**

Redd's motion is directed at the January 21, 2009 stop of Redd in his 1996 Oldsmobile Cutlass on I-35. The motion stresses that the officers had decided to stop him based upon their ongoing investigation, essentially complaining that the traffic violation was not the real cause of the stop. Redd asserts in his motion that his vehicle did not stray from its lane, also arguing that the stop was unreasonably long. In particular, Redd stresses the response of the DEA Case Agent Eric Smith, who, when asked during the *James* hearing whether he "expected" to find narcotics in Redd's vehicle, stated instead he believed it was a "possibility."

The government first notes that the officers' subjective intention in stopping the vehicle is irrelevant. *United States v. Botero-Ospina*, 71 F.3d 783, 787 (10th Cir. 1995). It argues that the officers had probable cause to believe that the vehicle contained narcotics. Even if there was no probable cause, it argues that the vehicle was validly stopped for a violation of K.S.A. 8-1522. The government argues that the stop was validly extended beyond the time of the original traffic stop, because the officers both gained a reasonable suspicion of criminal activity (indeed, as noted earlier, the government contends it had probable cause to believe the car contained narcotics even before it was stopped).

Alternatively, the government states that the stop was extended after Redd consented to the search. Finally, it contends that even if probable cause did not exist prior to the stop, after the stop

9

and its continuation (based upon reasonable suspicion) the officers gained probable cause to believe the vehicle contained narcotics, thereby justifying a search under the "automobile exception" to the warrant requirement. *See Pennsylvania v. Labron,* 518 U.S. 938, 940.

The court finds that Redd's motion to suppress should be denied. First, the court finds that the investigating officers had probable cause to stop Redd's vehicle as it returned to Kansas. Probable cause is measured against an objective standard, *Beck v. Ohio*, 379 U.S. 89, 96 (1964); *United States v. Soto*, 375 F.3d 1219, 1222 (10th Cir. 2004), and so the subsequent, subjective calculation by Agent Smith as to the chances of finding narcotics in the vehicle are irrelevant. There was mutually corroborating information from the wire intercepts showing that Redd was involved in narcotics trafficking, and apparently reliable information from police in Texas that Redd used three specific vehicles (a tan Mountaineer, a white Ford Expedition, and a blue Oldsmobile) which were known to have false compartments, and information that he would be returning to Kansas. The existence of a hidden compartment in a vehicle may itself furnish probable cause for a search. *See United States v. Ledesma*, 447 F.3d 1307, 1318 (10th Cir. 2006) (finding that it was "difficult to imagine a licit purpose for a large hidden compartment in a vehicle the size of a Chevy van, these signs of a hidden compartment strongly suggest–and perhaps even singlehandedly establish–probable cause to search"). *See also United States v. Olvares-Campos*, No. 06-40074-JAR, 2006 WL 2224789, *6 n. 31 (D. Kan. July 31, 2006) (holding that "officers had probable cause to search the vehicle once they found evidence of the hidden compartment," and citing cases). Here, the information as to false compartments was tied to several specific vehicles, and wiretap evidence showing that Redd was involved in the distribution of narcotics. Once the officers learned Redd was

in fact driving back to Kansas in one of the specified vehicles, a reasonable officer would have believed probable cause existed to stop the vehicle.

Even assuming the officers did not have independent probable cause to stop Redd's vehicle as it entered Kansas, they could legitimately stop the vehicle once it was observed to violate state traffic laws. The evidence at the hearing established that intercepting officer, DEA Agent and Highway Patrol Officer David Heim, saw Redd's vehicle stray across the inner media boundary at least three times. Heim testified that there was no wind or rain which would have caused Redd's vehicle to stray from its normal lane of travel. This testimony was uncontroverted. The dashcam video from the patrol car of Deputy Henry Cocking, who made the actual stop, shows that the stop occurred prior to dusk, and shows no weather conditions which would have affected driving. Accordingly, the vehicle could appropriately have been stopped under either K.S.A. 8-1522, or 8-1514(c).

A vehicle may be stopped for failing to maintain a single lane of travel under K.S.A. 8-1522 if, in addition the fact that the vehicle crossed lane markings, there is evidence that either (a) there were no circumstances rendering it "impracticable to stay within the lane markers," or (b) the vehicle's movement was not safe. *State v. Marx*, 289 Kan. 657, 215 P.2d 601 (2009). See also *State v. Rudolph*, No. 101,169, 2010 WL 348274, at *4 (Kan.App.2d Jan. 22, 2010) (following *Marx* and holding that officer has reasonable suspicion to stop a vehicle based upon his testimony that he did not believe rain would have affected the driver's ability to stay in a single lane, and videotape showed no circumstances making single-lane driving impracticable).

In contrast to the requirement under § 8-1522 that vehicles remain in a singe lane of travel if "practicable," a separate statute addresses "[d]riving on the right side of roadway," K.S.A. 8-1514(c) providing that, when driving on a multi-lane road, no vehicle may cross the center line:

> Upon any roadway having four (4) or more lanes for moving traffic and providing for two-way movement of traffic, no vehicle shall be driven to the left of the center line of the roadway, except when authorized by official traffic-control devices designating certain lanes to the left side of the center of the roadway for use by traffic not otherwise permitted to use such lanes, or except as permitted under subsection (a)(2) hereof [dealing with roadway obstructions]. However, this subsection shall not be construed as prohibiting the crossing of the center line in making a left turn into or from an alley, private road or driveway.

Unlike § 8-1522, § 8-1514 contains no "practicability" element. *See State v. Hopper*, 260 Kan. 66, 72, 917 P.2d 872, 876 (1996) (holding that K.S.A. 8-1514(a) was an absolute liability statute, and that, even though the record showed the roadway to be slick with patches of ice, "[w]e find no basis for judicially adding a 'road or weather conditions' exception to the four statutory exceptions"). *See also State v. Chavez-Zbarra*, 42 Kan.App.2d 1074, 221 P.3d 606 (2009). Given the driving behavior observed by Heim, the Redd vehicle was legitimately stopped under either statute.

In his Memorandum of Law submitted after the hearing, Redd argues that the stop was impermissibly extended by Deputy Cocking after the initial stop, stressing in particular that Cocking leaned in passenger's window to ask whether Redd would mind answering a few more questions.

The court finds that the defendant consented to the continued questioning and to the search of the vehicle. Deputy Cocking credibly testified to Redd's consent. Further, the video recording of the stop shows that Deputy Cocking leaned *on* the vehicle to speak to the driver, but did not lean *into* the vehicle in any significant way. Cocking had to speak close to the window because the conversation occurred only a few feet away from the traffic on a busy interstate highway. Further, as noted in the hearing, Cocking spoke to Redd through the passenger window, reducing the

12

potential for intimidation. Throughout the stop, Cocking's tone was conversational rather than threatening. While another officer had appeared at the scene prior to the time Cocking asked Redd to answer a few more questions, the video shows that he remained in the background. There were no displays of force. Nor does the video reveal an intimidated defendant, but rather both Redd and Cocking initially joking, apparently about how many Newport cigarettes the deputy found on Redd in the initial pat down.

The brief additional detention of the defendant was therefore supported both by defendant's consent as well as a reasonable suspicion of criminal activity. Thus, even if the wiretaps and information from the Texas police as to the vehicle's false compartments were found to be something less than probable cause (which is not the case), there remained a reasonable suspicion of criminal activity. When Redd, during the additional detention, consented to the search of the vehicle, the officers were permitted to expand the scope of the examination, and, upon the confirmation that the vehicle indeed contained secret compartments, had probable cause to seize the vehicle.

IT IS ACCORDINGLY ORDERED this 29th day of September, 2010, that the defendants' Motions to Suppress (Dkt. No's 163, 175, and 179) are hereby denied.

s/ J. Thomas Marten  
J. THOMAS MARTEN, JUDGE